The next case, Prasad v. Garland, the submission has been deferred. And with regard to the next case we're going to hear, it's Federal Trade Commission v. Elegant Solutions. Thank you. So we can now see ourselves, but we can't see anybody else. Thank you, Your Honor. Can you hear and see me? Yes. Thank you, Your Honor. Stephen Koschel appearing on behalf of the defendants, Elegant Services, et al. I'd like to take 14 minutes on my initial argument and reserve 6 for rebuttal. This is an appeal from an order granting summary judgment in favor of the FTC on all counts under Section 5 and 19 of the FTC Act and denying defendants motion for summary judgment. We contend that the trial court misapplied Rule 56 and appears to have adopted all the facts alleged by the FTC and overlooked the facts, that we set out at pages 14 through 23 of the brief and in other parts of the brief. Because of the Supreme Court's decision in AMG v. FTC, the FTC is not seeking monetary relief on the Section 5 claims, but is limited to permanent injunctions, leaving the Section 19 rules violations on the telephone solicitation rule. I don't understand. They're not limited to injunction. They also can get under Rule 19 various kinds of monetary relief, including refunds. Yes, Your Honor, that's exactly right. Well, you didn't say that. I thought I did say that, Your Honor. No, you said they're limited to injunctions. Go ahead. I'm sorry. If I said that, I misspoke. I'd like to make sure that the court has received my Rule 28J Notice of Supplemental Authority on Figge v. International, which we'll discuss at some length. Can I just say something? You seem to be jumping around. Could you give us some sense of order about what you're going to discuss and then do it in that order? Yes, Your Honor. We're going to be discussing several major arguments. We believe that appellants did not violate the TSR because Elegant and Heritage simply, these were the sales and marketing organizations, simply prepared documents for people wanting a consolidation or reduced payment. But that clearly isn't true. They didn't just prepare documents. I mean, that is not consistent with your submissions on the record. They arranged to or claimed they were going to make payments. They took money to make the payments. They weren't just filling out documents. Well, that's correct. They did make payments that were agreed to in the sales agreement. But under the Debt Relief Act or the Telephone Solicitation Rule, this calls for negotiating and settling claims with unsecured creditors. And the United States government is the party that secures any debts that are reorganized or revised pursuant to the government programs. And the only people, there were only documents prepared. There were no direct negotiations or phone discussions or anything like that. All that happened is that these people asked my clients to see what they were eligible for, and they submitted documents with supplement, with the information, and then made payments. And one of the reasons I think the FTC was incensed about this is that the payment processors for Heritage were not paying on a timely basis. And Reema Radwan fired three of these payment processors before finally deciding to take everything inside. Well, you say that she took it inside, but my understanding is that after the new companies were formed, they had other payment processors. No, no. That seemed to me to be the record. There's a little chart of the different payment processors, including payment processors after the change in companies. No. Heritage and Tribune ceased operations in 2000. Oh, I know that. Okay. And then in 2018, they established Elegant, and they had all their payment processing brought in-house. Trend was to deal with payment processing from Heritage as legacy clients, and then they also did recertifications, and they paid amounts, you know, paid Tribune and Heritage for those accounts. Can I ask one question I have about your overall position is, I understand your position with regard to the new corporations as to injunctions, but as to monetary relief, the overall contention here is this was all one enterprise, both before and after the change in corporations. So what's the relevance for your purposes of what happened at least there would be monetary relief for the period before the change in corporations,  On your authority. Thank you, Your Honor. On the change before corporations, there would be monetary relief available, but after they ceased their operations, there was no common enterprise after that. There has to be a sharing of resources, sharing of people. These are completely separate operations, and therefore there can't be a common enterprise. I'm sorry, what's to these? You mean now they're completely? No, they were as of 2018, as of when the FTC walked in the door and seized the companies. But at the point where Heritage and Tribune before that, they were no longer operating. So they couldn't be violating or about to violate the FTC Act. So there would be no monetary relief in that regard. And I misspoke a little about a minute earlier when you asked me that question. So there would be a separation on monetary relief at the point to where they ceased operations because of no violation or ability to violate. And then after that, there's absolutely not one shred of evidence that Elegant paid processing late. No, no, there is evidence. There are at least two individuals whose declarations are in the record who say that. No? And there is the monetary analyses of the FTC staff people who demonstrate that the money was not in fact paid. No? We would respectfully take issue with particularly the declarations. You have a much stronger argument to say there's counter evidence but not to say there's no evidence. There seems to be plenty of evidence. Well, there's at least counter evidence. And I'd have to look at the two declarations in question that were submitted by these folks. Is there not, if I can, for example, is there not specific evidence as to the violations of the telemarketing sales rule that essentially your clients placed customer payments in a holding account, correct? We conceded that, Your Honor. And did not segregate funds by consumers. You conceded that, correct? Yes, sir. And did not allow consumers to withdraw funds or pay consumers' interest on the balances. And that clearly would constitute a violation of the telemarketing sales rule, correct? Yes, sir. And we've conceded that. How do you say you substantially complied? I'm not sure if in your papers you said you substantially complied. I didn't quite understand what you mean by substantial compliance. Because no customer said that the money was stolen or they didn't get services for their money. None of the customers indicated dissatisfaction with that. Well, at one point, $60,000 was paid to one of the individual defendants out of that fund. That was Mazin Rodwin. It was a mistake, and he was supposed to repay those funds back. But he did. But I'm not sure it's from that particular account. I'd have to double-check, Your Honor. It is useful, if you come here and argue, for you to know the record. At this point, we seem to know the record better than you do, which is not a good way to be proceeding. He didn't pay it back. Go ahead. And it was from that account. According to the record, I mean, as I read it, I read it. I stand corrected, Your Honor. I stand corrected. I think in terms of... Then do you concede, then, regarding Count 2, in terms of your attack on the granted-of-summary judgment, it appears that you clearly acknowledge that there is a violation of the telemarketing sales rule, clearly, under Count 2, correct? Yes, Your Honor, but we take issue as to whether there was any damages pled or proven as part of the summary judgment. The TSR, particularly with respect to the Figge case, Figge was a refund case under Section 19. The Commerce Planet case cited by the FTC doesn't state the standard for Section 19. It's Section 5 cases through Section 13B. So the bottom line is that if, you know, because valuable services were performed. And the overwhelming evidence is that everybody who wanted a consolidation got it. Tell me how you think Figge helps you. Well, I think Figge stands for the proposition, as we set out in our Notice of Supplemental Authority, that the statutory language says you can get a refund if the court finds it necessary to redress injury to consumers. But then they go on to say that there can be no redress without proof of injury. I thought what they said is there's a presumption of injury. No. They did say that. No, I believe that that's Commerce Planet, Your Honor. You believe it's what? I'm sorry? I believe that's Commerce Planet that has a presumption of injury. And so the relief must be necessary to redress the injury, and the relief cannot give the consumers a windfall. It can't be inequitable. And in this case it would be inequitable to give the full refund when people actually got services that were valuable to them and which they desperately needed in terms of financial relief because they were all pretty much distressed and seeking consolidations or relief from their then current loans. It would be unfair and unjust enrichment. So we respectfully submit in Figge, the court gave the FTC a choice. You can go back and let the consumers make an informed choice as to whether they keep their heat detectors, because it was a products case, instead of returning them for refunds. But in this case, you know, the FTC hasn't identified any specific people who suffered harm as a result of their funds being billed. If I may, this is what Figge says. It says that the injury, whether it's a fraudulent sale, doesn't limit their recovery to the misrepresentations taped to the purchasing decisions. If they'd been told the truth, perhaps they would not have bought it at all. And the fraud is in the selling, not the value of the thing sold, and that entitles consumers in the case to full refunds. So it essentially says even if there is value in what they bought, if they fraudulently sold it, were sold it, then they can get a refund because they might not have sold it at all. That's what it says. Well, we would respectfully submit that there is nothing in the statute that allows presumptions of that nature. It certainly turns the concept of burden of proof upside down, Your Honor, and in light of AMG, is not a presumption that is rooted in the text or the structure of the statute. So we respectfully take issue with that approach. And the other thing is that this is an issue that could have been easily corrected without destroying a company that otherwise had very good sales practices. The FTC did not have any problems with the sales agreement. The declarations of the various people were deficient because they didn't, they had absolutely no proof that there was anything said that unlawfully induced these folks to enter into a sales agreement. And so the sales agreement itself did note that there was the third party payment process. Excuse me again, I'm sorry, but there was evidence that they were telling people that they were going to be the servicer, which they were not. They were telling people that they would make the payments and that their time, they would in the long run pay a lot less. And as it turned out in many instances, they were left with all of the interest unpaid and the principal still unpaid as well. And the company having taken a large amount of fees without really having accomplished anything for them. It is not helpful for you to stand up here and say there was no evidence. There was a lot of evidence. You could stand up and tell us what your counter evidence was again, but there was certainly a lot of evidence. Well, our counter evidence is, is in the declaration of Rima Radwan and Dean Robbins, part of part of which was excluded by Dean Robbins. One of the affidavits was excluded by the trial court. I see. Is there not, is there not clear record in this case that almost as a pattern, the defendants rebranded the company, transferred assets and restructured companies. And when it was moved into new States, isn't that a matter of clear fact on the record here? I don't, the location of the company was not changed, but there was transfer of assets between companies. Was there not, there was a purchase of assets between trend and tribune and heritage. And before that they rebranded the name because of some misconduct by a and they wanted to distance themselves from that partner. That's in an earlier iteration of the, so there was, there was a pattern of rebranding as they went into different States, be it on the West coast or the East coast. Correct? Yes, your honor, but that's not illegal. No, but I'm talking about evidence in terms of you're saying evidence and absence of any evidence in the case is judge Burson is no, there's, there's pretty overwhelming evidence of that kind of pattern. You can draw certain inferences or argue that inferences should not be drawn, but there's clearly was a pattern of restructuring companies and transferring assets. Correct. And Mr. Radwan and Mr. Robbins submitted legitimate explanations for that, that are not indicative of anything untoward. I would like to reserve some time for rebuttal. You're okay. Thank you very much. Thank you. Mr. Hoffman. No, you're on mute. This is like every, in every argument, there is at least one. I'm sorry. I, I, you know, a rookie mistake, I guess. It's just become a joke. And in terms of the week, I know some lawyers sometimes want to put appellate judges under mute at times, but that's another matter. May it please the court. I'd like to make sure that I deal with the remedies issues, but let me start with the merits. And let me start with the TSR violations. Same system. I'm sorry. Could you hear me? Yes. Okay. I'm sorry. I'd like to start with the, the TSR, the TSR violations, because I think that the red ones openly admit to taking advanced fees without complying with DSR requirements. I thought I, you're kind of freezing every so often. Keep going. Let's see how it goes. Okay. I apologize for that. I just said, I said the, the rad ones I think have admitted to taking advanced fees without complying with the TSRs escrow requirements. I think I heard Mr. Coachelle concede that today. So I think that's really not an issue here. Is that, are those violations sufficient to justify the relief granted? Probably not the whole injunction because some of the well focusing on the monetary relief. Certainly no one, you know, Mr. Coachelle hasn't argued before today that those violations aren't sufficient to justify the monetary relief. I mean, he raised figgy for the first time last night, but this argument was not made in the, in the district court. So I think that argument is waived, but in any event the TSR also prohibits deceptive representations in context with telemarketing. So all of the conduct that violates section five also violates the TSR. And that's certainly a basis for the monetary relief as well as the injunctive relief on, on the deceptive representations. There's overwhelming evidence here that the rad ones may deceptive representation to consumers. The courts mentioned a lot of it, but obviously we have declarations from 19 consumers. There are declarations from FTCs case investigators, hundreds of pages of the rad ones, internal documents, marketing materials, financials, and their own deposition testimony. The rad ones make a lot of factual assertions in their brief. And I think if you look at the record, which the court clearly has, you'll see that a lot of them don't stand up to scrutiny. There's really no genuine factual dispute. Mr. The web page, the, the agreement page was set up so that it went from signature to signature. And, um, um, Ms. Radwin, uh, directly contradicts that. She says, absolutely not true. I went to all kinds of, um, uh, efforts to assure that that wasn't true and to, um, negated and so on. Now, well, what do we do with that in summary judgment? I think if you look at Mr. Robbins, his declaration, deposition testimony, and I don't have the site to it here, although I happen to give it to you later on. So in our brief, he's very clear that that's what he did. What he said is that he put a signature block on each page, um, but that it would automatically flip to it. And he's the one who set up this. So I don't think that's a genuine dispute of fact, but in any event, let's talk about Rima Radwan step of declaration, because I think she really doesn't dispute many of the key facts. Um, and she actually confirms many of them. Um, she doesn't dispute that each of the FTC's declarants were promised that their payments would be reduced to the amounts marketed quoted by the telemarketers. She doesn't dispute the amount of the payments, the fact that they collected this money. She doesn't dispute that many of the consumers were placed in $0 payment plans, even where they had income that disqualified for them, these plans. There is a major dispute about the amount of that though. I mean, uh, Mr. Robbins declaration, the one that was not admitted, I think it was the one that was not admitted. It says it was 7% and the government's, um, the FTC's numbers are like 80% or something. It's a little hard to figure that out. I don't think that's quite correct as to Mr. Robbins declaration. The one that was excluded really talks about, um, the, um, the, uh, and the argument that they've made have talks about, um, the amounts that were deducted as payments to lenders. And I don't think there's a genuine dispute about that. I'm happy to deal with that. But in any event, um, there's certainly no dispute that in the vast majority of the cases, um, you know, for 15 of our declarants, nothing was ever paid in their loans and that for the rest of them, only one or two payments were made. And that's really the gravamen of this case. Your honor is that these people were promised that they were, that their loans would be reduced. They were led to believe that the money was going to be paid to the lenders and nothing was paid to the lenders. In most cases, when it was paid, it was only done sporadically on an ad hoc basis. That's what made this deceptive. Um, and so, you know, another thing I wondered about is, all right, you have 19 declarants. What leads us to think that they're representative of anything? Well, first of all, I mean, 19 people telling a pretty consistent story, I think tells you something, but again, we're not just relying on those 19 people. Um, you know, as we've, we've put in things like records that show the sales scripts, um, and we've given you the recording of a recording, which showed that some of the language that was used in this, in this, in the, in the, um, calls came right out of the Radwan sales scripts. We've given you the declaration of Connor Geeran, which analyzes the, um, the FTCs, um, the FTC, the, uh, the Radwans, um, financials, and shows how many of them were in $0 payment plans and how many of them. I think that's the one I meant, because that should set 80% or a huge amount. Yeah, I, I don't think there's any, any, any legitimate dispute as to that. Um, and I certainly don't think that that's an argument that, um, that the Radwans have raised. Um, in any event, um, in addition to that, of course, there's the prior, um, actions by states raising, um, raising many of the same types of problems against the Radwans, um, their predecessor, predecessor businesses. So, you know, I think that, um, that it's not simply that, you know, there are 19 people. It's the 19 people plus all the other evidence. And again, we haven't seen, we haven't seen any, um, um, you know, evidence of a single satisfied customer that the Radwans have produced. Um, the court mentioned FIGI and, you know, the, the language that I would point to in FIGI, um, is at the bottom of, this is 994F2nd, um, at the bottom of 605. It says, a presumption of actual reliance arises once the commission has proved the defendants made material representations, that they were widely disseminated, and that consumers purchased the defendants' product. Well, I think that's what we have here. They made material misrepresentations. They made them to a number of people, um, and people believed that, signed up for these services. Um, I think contrary to what Mr. Coachell said, um, these consumers did not receive anything valuable from, um, from the defendants. They were ripped off. Um, they were told that their money would be going, that they would be paying less to,  to their lenders, and they ended up, the money wasn't paid to the lenders, and not only that, they had to pay late fees, they had damaged credit history. So there was very serious damage here, um, to, uh, the consumers. Mr. Hoffman, if I might, if I can, just to make sure on the issue of, any genuine issues of material fact, the, the one defendant, Labiba Radwan, if I'm pronouncing, um, her name correctly, she was never an owner of the company, correct? Isn't that in the record? Yes. She was not an owner of the, I know that she apparently performed certain functions, um, and she held herself out as the director of operations, uh, but, um, is there, are there any facts here in terms of her, disputed facts in terms of her actual involvement, with respect to this alleged fraud? No, I, I don't think there's any, any actual dispute as to what, um, Labiba did, um, you're correct that she was not an owner, um, she described herself as the HR manager director, or director of operations, um, and she, She was the customer contact, was she not? She was certainly the staff, the person who supervised the staff, she hired, um, and fired the staff, um, you'll see she was also very involved in issues like, when they decided to make payments to lenders, she's the one who kind of decided whether they would do it, and how much, if you look at page, uh, 49 of the supplemental excerpts of record, you'll see it's a text exchange involving Labiba, where she's, she says, um, you know, the salesperson says, well there are, um, we've got $10,000 in trust here, um, and she says, well pay five to the lender, so she did things like that, um, she also, um, Rima Ragwan, as I understand it, was ill, and often not in the office, uh, Labiba shared an office with her, and so Rima would relay instructions through Labiba to the staff, so, uh, she was really the person who was, who was very involved in the day-to-day management of the company, um, and that's the basis for, um, for her liability. Um, there were, Mr. Coachell talked also a little bit about the, uh, you know, the change from the predecessor company's, um, Tribune and Heritage to the current, um, Elegant and Trend. I, I just want to briefly say that, you know, what we have here is a classic example of, um, defendants, um, the same four people, just putting on different hats, but running the same business in more or less the same way. Um, there's no significant evidence that Elegant ran its business, um, any differently than the previous, um, than the previous entities. Um, the two consumers that we have who signed up with Elegant continue to, they both report that neither, nothing was paid on their loans. Um, and, um, they, um, you know, keep in mind that also many of the consumers who were signed up by the predecessor entities continue to be serviced by, um, by, by Trend. Um, and again, when the same problems were happening, their loans were not being paid except on an ad hoc basis. Um, are there additional questions about the merits or should we discuss the remedy issues? Well, the remedy issues. Judge Burson, if I can just ask one question on, just one before that, essentially in terms of the, the record as well, the, the, all these corporate defendants were owned and controlled by three individual defendants, Rima Radwan, Mazin Radwan, and Dean Robbins. Correct. Correct. They were all owned by them. They were all owned by them. And, uh, and they, the companies interchangeably shared resources, rent payments, building, um, et cetera. Correct. Right. And there's a, there's some time differences. Yes. And just so I'm clear on the record, uh, as to my earlier question as to Labiba Radwan, it's a slightly different analysis. I'm not saying there's not an analysis, but it's a slightly different analysis as to her. Correct. It's a slightly different analysis in that she is not an owner of the businesses, but she is a manager of the businesses. I understand. I understand. Right. I'm sorry. I didn't mean to interrupt you, Judge Burson. And there's also the question of the, the car company and how tied in it is. And I understand there are a few respects, including the fact that its name appears on some of the documents, they say erroneously, but, um, it's at least peripheral, somewhat peripheral. Well, so on the car company, um, the corporation is called Dark Island. Um, and certainly one of the things that it did was run a car company. Um, I think it's very clear that this was, and there's really no dispute about this, that it was financially intertwined with the other businesses, um, and really dependent upon them. So, um, you know, as the Radwans acknowledged in their brief trend is paying the rent for Dark Island. Um, Dark Island is paying to renovate the space used by Trend and Elegant. Um, so there's transfers of value between the companies. They're all owned and managed by the same person. And the receiver, um, found that, you know, the car business was, although legitimate business, it wasn't a self-sustaining business. It was dependent on and intertwined with the, um, the, uh, debt relief business, um, couldn't stand on its own. So, that, in addition to all these other factors, common ownership, sharing a common building, all those things, I think more than, is more than sufficient to show that, uh, Dark Island is part of the common enterprise. And there's really no dispute about any of the facts. So, as to the remedy issues, um, I should begin by saying that I don't have particular issues with your legal analysis, um, as to what section, um, whether AMG is, is preclusive here and so on. But, the exact, I, I do have some issue with the exclusion of, uh, Robin's declaration because it was filed a week late. And I, I want to know what the consequence of that is to the calculation of the amount of the remedy. Um, so, um, I think, uh, the question here is whether the district court abused its discretion in excluding that declaration. Um, I think it's, I think the answer is no, it doesn't matter. And here's the reason why, um, the FTC's, um, investigator, uh, Mr. Jenkins, um, calculated the total amount, um, the total amount of the net revenues, um, using the RAD ones, tax returns, their profit and loss statements. And in one for trend, he didn't have tax returns or profit and loss statements. So he used bank statements. And as he explains in his declaration, um, that, um, in the, in general, um, with a couple of exceptions, the tax returns and the profit and loss statements had already deducted things like the, any refunds to consumers or payments to lenders. So he didn't have to deduct those things a second time. Um, what Mr. Robbins does in his declaration is ignore the tax returns and the, um, and the, um, profit and loss statements and look solely. I mean, it does seem a little odd that Mr. Jenkins didn't look at that. He had the bank statements. Apparently not to use them seems a little peculiar. At least it's a check. I think, I think, I think that he showed his view was that, um, I can't speak for him, but certainly the most reliable evidence is what the defendants were putting in their tax returns and their profit and loss statements. Um, Mr. Jenkins looks at the bank statements and says, um, and says, well, I see these, these, um, these payments to lenders here and I didn't see anything about those in your declaration, but that's because he's looking at a different source. So it's really an apples and oranges problem here. Um, I don't think that it, you know, it demonstrates anything wrong with what Mr. Jenkins did. Um, you know, it's simply, um, it's simply different people looking at different documents, but in any event, um, even as I said, you know, the, the court was well within its discretion to exclude that declaration based on, and not just that this particular filing was late, but that there was a pattern of late filings and misconduct and that it was prejudicial to, um, that it was prejudicial to the FTC. Um, you know, the case was very clear that if you don't file a motion demonstrating accusable, excusable neglect, it's not an abuse of discretion. No motion was filed here. So I think there's just no, no legal argument that the court, um, abused its discretion in excluding that. But as I say, even if there was an error, I think it was harmless because, um, it's really an apples and oranges situation. Mr. Hoffman, I have a question regarding the sum, the $27.5 million judgment. And as I understand it, the $27.5 million was to refund losses to the persons who were, uh, inveigled. Um, but it doesn't appear to me that all that money is going to be paid back as refunds to those persons. There seems to be the ability of the court of the, uh, FTC now to, to distribute that money in refunds, one, two, and advertising to see if other claims should be filed. And then what really bothers me is that if there's some money left over after all of that, it goes to the federal government. Do, do I read that correctly? I think you are reading the judgment correctly, judge bear. And, um, well, in that case, in that case,  which says that it should be a recovery for refunds to persons who've been built and, uh, not punitive. I have a couple of things to say about that. I mean, first of all, I think it's a, it's a very valid argument. It's not an argument that was raised by the rad ones in this case. So I think that the argument is, is waived, um, as a practical matter, I can tell you that the FTC, um, does intend to refund, um, every penny that it gets to consumers. We have a very good track record of doing that, um, um, under the old 13 B case law, of course. Um, but, um, we, you know, generally collect much less than we, than the face amount of the judgment in a case like this. In particular, we know exactly who the victims are. And so I, I am quite confident that, um, that all of this money will go to consumers. Now, if you're asking me, if you're one thing, the figgy case does do is say, essentially you can't do that. So, you wouldn't have any problem, we just strike that part of the injunction, I gather. I, I would not have a problem with it. Um, I don't know that I'm fully authorized by management to make that concession, but I'm, I'm happy to make that concession nonetheless. At least for purposes of this case, please don't hold me to it in future cases. I didn't quite get the, the injunction, uh, amendment that you were proposing. That's taking out that, the, the part of the injunction that, that says that any money left over goes to the federal government. We're being told that it's not going to happen anyway, but figgy, does specifically address that and say you can't do it. Yeah, I mean, what might be a, a more appropriate language would be to say that if there's any money left over, which, again, I don't think it's going to happen, that the FTC should go back to the court for instructions on what to do with it. Why go back to the court for instructions you shouldn't have gotten in the first place? Um, well, I mean, if there's, I mean, if, if the reason that we haven't gotten it is because we can't locate consumers or anything like that, I would, my instinct would be to ask the court for guidance as to what to do with it. Um, but, um, I, I leave it to the court to determine what the best way of dealing with that, um, issue is. Um, but certainly I, I, you know, figgy says what it says. Um, and the statute does say for the benefit of consumers. So I think that does raise a question. I don't think the issue has been properly, has been properly raised here. So, I mean, my view is that it's waived, but I understand that point. Uh, but if, to, to, to the extent that it's money left over for the government, that it seems to me the thing to do, we give it back to the defendants. Uh, you know, I, I leave that, I leave that to the court. Um, I, I think it's a, it's, it's not going to happen. There's, you know, whatever money we collect is going to go to consumers. I am, I am 99.9% confident of that. Well, also, is there any chance you're going to get $27 million? Zero chance. We got $27 million. I don't know how much we've collected already, but the, the likelihood of our getting the full amount is, is, is minimal. Um, unless the defendants win the lottery tomorrow or something like that. Um, if there are no further questions, we'd ask that the judgment be affirmed. Thank you very much, sir. Thank you, Your Honor. Um, a couple of points. Um, I would respectfully submit that there's,   Um, and, and I, again, subject to different circumstances, I, I, I, I, I, I, I,         I, I, I, I, I, I, I'm just, I'm just double checking, but I'm, my recollection is that nobody said my credits been smeared. I don't see any evidence that somebody says I've gotten so much in late fees. Um, uh, so I don't think that's part of the record, uh, with Labiba, uh, Radwan. Um, she was mainly a gopher to help, uh, uh, Rima Radwan. And so she did convey messages. She did HR primarily for payment of, uh, payroll and people would occasionally consult with her about things if they had a problem, but that doesn't make her a manager. Did she ever make, did she make decisions as to which payments to make from the, from the supposed address fund? At best, it's merely a suggestion, you know, pay 5,000, but it was, it was left to the sales representative. Suggestion to whom? I'm sorry? Suggestion to whom? Not, not to the bank? Was there a direction to the bank to do this? No, it was a, it was not a direction. It was a suggestion to, uh, uh, a customer service representative who wanted, who wanted to consult with somebody before they made a decision. That doesn't necessarily make her a manager. A customer service representative decides what, what money to take from the trust fund and, and pay to the bank, to the, um, lender? Again, I'm sorry, I don't remember whether it was, um, the, uh, a supervisor or a customer service rep, um, but it was obviously, you know, uh, did she have the authority to make payments from the trust fund? No, no, she did not. She was an HR rep. But I thought she, was she not on the bank records, on the bank accounts? No, I don't believe so. No, ma'am. Well, you say, for example, she didn't have a credit card, but they say she did have a credit card. I mean, the problem with this case, to be frank, is that you make a lot of untrue statements, and there may be some true statements buried in there, but they're very hard to find. Well, we, we've, we've briefed it as best as we can, Your Honor. She was definitely, she was, she, uh, she was definitely the director of operations. The record is clear on that, correct? It was a title that she had to have. Well, but that was her title. That was her title. She was the director of operations, and that's how she was held out to the public, correct? No, it was held out to the bank, not to the public. Well, I mean, to the, either to the bank or the public, and she was clearly the source of customer contact for several of the services, was she not? She didn't, I don't, I don't believe she talked to any customers. She was, uh, as she, she would talk to customer service representatives, but she was not their supervisor. They had separate supervisors, uh, in Tribune and Heritage. Well, suffice it to say she had interaction with customers or their representatives, correct? Not, no, not with customers. Um, with respect to, um, the exclusion of the affidavit, I would respectfully support, I would point out that the FTC violated local rule 7.3 when they brought that exclusion motion, which is ironic when they violate a rule intentionally in order to, uh, seek sanctions against another party. Similarly, they, they responded fully the next day with a declaration from council criticizing Mr. Robin's declaration. That's waiver. Neither of those facts were considered by the judge. This is a $14 million addition to, uh, to the damages because anybody who's an accountant knows you, you look at all the bank statements to see money in money out. You, you don't rely on profit and loss statements, which don't really look at, at lender payments, uh, specifically. And the other thing, uh, in terms of, you know, whether these are horrible people, which of course the FTC portrays them, they, they, they took this, uh, business, this, this, uh, processing business in-house to avoid the errors. And then they had trend actively go out and look at payments that hadn't been made. And 80% of the payments were made by the time that the, uh, company was closed by the FTC. This is behavior that the government should support. Uh, and, and, and not look at in terms of people who can't, uh, you know, be trusted in the future, uh, with respect to, um, uh, Dark Island, we respectfully submit that Dark Island had very little to do with, um, with the issue of, of, of intertwining funds did not go between Dark Island and, uh, the companies. There was a lease agreement. There was value being exchanged as the FTC, uh, lawyer admits here. And the bottom line here is that everything, they were completely walled off in terms of employees, business, uh, Mazen, uh, controlled that business entirely. The other people were passive owners, period, end of story. And the FTC is overreaching just as they did an AMG to, to try and, and get at these assets. And SEC versus Lou talks in terms of limiting this, the, the sweep of government power. And so, whereas here, the only, uh, uh, interplay was, uh, Dean Robbins and, uh, Miss Labiba Radwan. These are ancillary players. Uh, they didn't control the policies at any of these companies. They didn't change the policies. They had no power to do so. Thank you very much. Your honor. Thank you both for your argument in this rather complicated case. FTC versus Elegant Solutions is submitted and we are adjourned. Thank you. Thank you, your honor.
judges: BERZON, BEA, Bennett